IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**RICHARD J. SHEETS, individually and**        :
**on behalf of others similarly situated**
3206 Christine Lane                            :
Oregon, Ohio  43616

                                               :

**NICHOLE WAWRZYNIAK, indivdually**
**and on behalf of others similarly situated**  :
26777 Lakevue Dr., Apt. #4
Perrysburg, Ohio  43551                        :


**JEFFREY WEILLS, individually and on**        :
**behalf of others similarly situated**               Case No.:
8280 Main St., PO Box 391                      :
Neapolis, Ohio  43547                                Judge
                                               :
**DEION C. BARNETT SR.**                             <u>**COMPLAINT**</u> **with Class Action**
7323 Sioux Trail                               :     **Allegations**
Holland, Ohio  43528
                                               :     **(Jury Demand Endorsed Hereon)**
**DENNIS BEAVER**
7416 Berkey Hwy                                :
Bussfield, Michigan  49228

                                               :

**DON K. BYERS**
8870 TR 36                                     :
Fostoria, Ohio  44830

                                               :

**LA DONN COLEMAN**
728 Wyman Street                               :
Toledo, Ohio  43609

                                               :

**MATTHEW G. CONDON**
10225 Poplar St.                               :
Milton Center, Ohio  43541

                                               :

**EDMUND CONTRERAS**
5678 School Rd.                                :
Petersburg, Michigan  49270

                                               :

**ANDREW CZOP**
9515 Summerfield Rd.                           :
Temperance, Michigan  48182

1

:

**WILLIAM F. DEAR**
43123 Ironsides Ct.                    :
Canton, Michigan  48187

                                       :

**SCOTT A. DESELMS**
125 Farnstead Dr.                      :
Northwood, Ohio  43619

                                       :

**RYAN DEVOL**
2312 Brookridge Dr.                    :
Toledo, Ohio  43613

                                       :

**ROBERT L. DOTSON**
1429 Millbury Rd.                      :
Northwood, Ohio  43619

                                       :

**MELISSA DOTSON**
1429 Millbury Rd.                      :
Northwood, Ohio  43619

                                       :

**MARCUS EVERLY**
722 Taft St.                           :
Port Clinton, Ohio  43452

                                       :

**PAMELA GILMORE**
4866 295th St.                         :
Toledo, Ohio  43611

                                       :

**RANDY HALL**
9239 Apple Cider W                     :
Newport, Michigan  48166

                                       :

**EVE HARPER**
634 Martin Avenue                      :
Defiance, Ohio  43512

                                       :

**JAMES M. HARRISON**
6524 N. Twp Rd. 64                     :
Fostoria, Ohio  44830

                                       :

**ROBERT E. HARTWIG**
758 Barclay                            :
Toledo, Ohio  43609

                                       :

**KIM HAYWARD**

2

4213 Willys Pkwy                              :
Toledo, Ohio  43612
                                              :

**RANDALL A. HOLVEY**
20915 W. Camper Rd.                           :
Genoa, Ohio  43430
                                              :

**LISA HORN**
28281 Simmons Rd., Apt. 7                     :
Perrysburg, Ohio  43551
                                              :

**JOSE HUERTA**
9198 Legacy Ct.                               :
Temperance, Michigan  48182
                                              :

**KENNETH A. KOHN**
5125 Brenden Way                              :
Sylvania, Ohio  43560
                                              :

**ANTHONY M. KOPERSKI**
8304 Main St.                                 :
Neapolis, Ohio  43547
                                              :

**WILLIAM KUEHLING**
5301 Pageland                                 :
Toledo, Ohio  43611
                                              :

**SHAWN MADALINSKI**
709 Sandralee                                 :
Toledo, Ohio  43612
                                              :

**GREGORY MATTICE**
5754 Mantey Lane                              :
Toledo, Ohio  43623
                                              :

**DANIEL MILLER**
5755 Shawnee Ave.                             :
Walbridge, Ohio  43465
                                              :

**NIKOLA NEDESKI**
2647 Edgar St.                                :
Toledo, Ohio  43613
                                              :

**EARL R. OSWALD III**
2300 Mason Dr.                                :
Temperance, Michigan  48182

        :

**PANFILO RAMON, JR.**
925 Arrowhead Trail        :
Wauseon, Ohio  43567

        :

**JASON RENNER**
540 Grace Way        :
Rossford, Ohio  43460

        :

**WILLIAM D. RENNER**
921 Sandusky St.        :
Perrysburg, Ohio  43551

        :

**SHARON RIGER-LONG**
5207 Rowland R d.        :
Toledo, Ohio  43613

        :

**TRACEY RIVARD**
9239 Apple Cider W        :
Newport, Michigan  48166

        :

**DENNIS J. ROSS**
3337 Deepwood        :
Lambertville, Michigan  48144

        :

**HOWARD F. RUDES**
5219 President Dr.        :
Toledo, Ohio  43611

        :

**JAMIE SCHETTER**
12 W. Tiffin St., PO Box 123        :
New Riegel, Ohio  44853

        :

**DONALD J. SINCLAIR**
2684 Pinetree        :
Trenton, Michigan  48183

        :

**MATTHEW SMITH**
6027 Blossman Rd.        :
Toledo, OH 43617

        :

**MICHAEL STUKENBORG**
1740 Glenross        :
Oregon, Ohio  43616

        :

**MARC STYLES**

2195 Newman                                    :
Trenton, Michigan  48183
                                               :

**KELLEY SZYCH**
2323 Shoreland Ave. #102                       :
Toledo, Ohio  43611
                                               :

**PAUL ULMAN**
7539 Jeffers Rd.                               :
Whitehouse, Ohio  43571
                                               :

**SAM WITHROW**
232 Bertha Ave.                                :
Clyde, Ohio  43410
                                               :

**JOSEPH A. WOOD**
85 Ella St.                                    :
Tiffin, Ohio  44883
                                               :

              Plaintiffs,
                                               :

      v.                                       :

                                               :

**FCA US LLC**
c/o Chris Pardi, General Counsel               :
1000 Chrysler Drive
Auburn Hills, MI 48326                          :
      Statutory agent:
      CT Corporation System                    :
      4400 Easton Commons Way,
      Suite 125                                 :
      Columbus, OH 43219
                                               :

and
                                               :


**INTERNATIONAL UNION, UNITED**               :
**AUTOMOBILE, AEROSPACE AND**
**AGRICULTURAL IMPLEMENT**                     :
**WORKERS OF AMERICA**
c/o Dennis Williams, President                 :
Solidarity House
8000 E. Jefferson Ave.                         :
Detroit, MI 48214
                                               :

and

                                                          :

**UNITED AUTOMOBILE, AEROSPACE**            :
**AND AGRICULTURAL IMPLEMENT**
**WORKERS OF AMERICA, REGION 2B**           :
c/o Rich Rankin, Director
1691 Woodlands Dr.                          :
Maumee, Ohio 43232

                                                          :

Defendants.

                                                          :

## INTRODUCTION

1.      Now come Plaintiffs, all individuals who were hired by nominally independent

suppliers to work in a Chrysler plant, then (among other things) unlawfully stripped of their

Chrysler benefits and seniority, and bring this action against FCA US LLC and their labor union,

the United Automobile, Aerospace and Agricultural Implement Workers of America (the

"UAW"), for breach of a collective bargaining agreement pursuant to the Labor Management

Relations Act, 29 U.S.C. § 185, ("LMRA") and against their labor union, the UAW International

Union, for violations of its duty of fair representation by accepting bribes to bargain away

Plaintiffs' seniority and benefits, pursuant to Section 301 of the LMRA (codified at 29 U.S.C. §

185).

## PARTIES

2.      Plaintiff Richard J. Sheets is an individual residing in Oregon, Lucas County,

Ohio. Richard J. Sheets is a citizen and resident of Ohio.

3.      Plaintiff Nichole Wawrzyniak is an individual residing in Perrysburg, Wood

County, Ohio. Nichole Wawrzyniak is a citizen and resident of Ohio.

4.      Plaintiff Jeffrey Weills is an individual residing in Neapolis, Lucas County, Ohio.

Jeffrey Weills is a citizen and resident of Ohio.

5.      Plaintiff Deion C. Barnett Sr. is an individual residing in Holland, Springfield County, Ohio. Deion C. Barnett Sr. is a citizen and resident of Ohio.

6.      Plaintiff Dennis Beaver is an individual residing in Bussfield, Lenawee County, Michigan. Dennis Beaver is a citizen and resident of Michigan.

7.      Plaintiff Don K. Byers is an individual residing in Fostoria, Seneca County, Ohio. Don K. Byers is a citizen and resident of Ohio.

8.      Plaintiff La Donn Coleman is an individual residing in Toledo, Lucas County, Ohio. La Donn Coleman is a citizen and resident of Ohio.

9.      Plaintiff Matthew G. Condon is an individual residing in Milton Center, Wood County, Ohio. Matthew G. Condon is a citizen and resident of Ohio.

10.     Plaintiff Edmund Contreras is an individual residing in Petersburg, Monroe County, Michigan. Edmund Contreras is a citizen and resident of Michigan.

11.     Plaintiff Andrew Czop is an individual residing in Temperance, Monroe County, Michigan. Andrew Czop is a citizen and resident of Michigan.

12.     Plaintiff William F. Dear is an individual residing in Canton, Wayne County, Michigan. William F. Dear is a citizen and resident of Michigan.

13.     Plaintiff Scott A. DeSelms is an individual residing in Northwood, Wood County, Ohio. Scott A. DeSelms is a citizen and resident of Ohio.

14.     Plaintiff Ryan DeVol is an individual residing in Toledo, Lucas County, Ohio. Ryan DeVol is a citizen and resident of Ohio.

15.     Plaintiff Robert L. Dotson is an individual residing in Northwood, Wood County, Ohio. Robert L. Dotson is a citizen and resident of Ohio.

16.     Plaintiff Melissa Dotson is an individual residing in Northwood, Wood County, Ohio. Melissa Dotson is a citizen and resident of Ohio.

17.     Plaintiff Marcus Everly is an individual residing in Port Clinton, Ottawa County, Ohio. Marcus Everly is a citizen and resident of Ohio.

18.     Plaintiff Pamela Gilmore is an individual residing in Toledo, Lucas County, Ohio. Pamela Gilmore is a citizen and resident of Ohio.

19.     Plaintiff Randy Hall is an individual residing in Newport, Monroe County, Michigan. Randy Hall is a citizen and resident of Michigan.

20.     Plaintiff Eve Harper is an individual residing in Defiance, Defiance County, Ohio. Eve Harper is a citizen and resident of Ohio.

21.     Plaintiff James M. Harrison is an individual residing in Fostoria, Seneca County, Ohio. James M. Harrison is a citizen and resident of Ohio.

22.     Plaintiff Robert E. Hartwig is an individual residing in Toledo, Lucas County, Ohio. Robert E. Hartwig is a citizen and resident of Ohio.

23.     Plaintiff Kim Hayward is an individual residing in Toledo, Lucas County, Ohio. Kim Hayward is a citizen and resident of Ohio.

24.     Plaintiff Randall A. Holvey is an individual residing in Genoa, Ottawa County, Ohio. Randall A. Holvey is a citizen and resident of Ohio.

25.     Plaintiff Lisa Horn is an individual residing in Perrysburg, Wood County, Ohio. Lisa Horn is a citizen and resident of Ohio.

26.     Plaintiff Jose Huerta is an individual residing in Temperance, Monroe County, Michigan. Jose Huerta is a citizen and resident of Michigan.

27.     Plaintiff Kenneth A. Kohn is an individual residing in Sylvania, Lucas County, Ohio. Kenneth A. Kohn is a citizen and resident of Ohio.

28.     Plaintiff Anthony M. Koperski is an individual residing in Neapolis, Lucas County, Ohio. Anthony M. Koperski is a citizen and resident of Ohio.

29.     Plaintiff William Kuehling is an individual residing in Toledo, Lucas County, Ohio. William Kuehling is a citizen and resident of Ohio.

30.     Plaintiff Shawn Madalinski is an individual residing in Toledo, Lucas County, Ohio. Shawn Madalinski is a citizen and resident of Ohio.

31.     Plaintiff Gregory Mattice is an individual residing in Toledo, Lucas County, Ohio. Gregory Mattice is a citizen and resident of Ohio.

32.     Plaintiff Daniel Miller is an individual residing in Walbridge, Wood County, Ohio. Daniel Miller is a citizen and resident of Ohio.

33.     Plaintiff Nikola Nedeski is an individual residing in Toledo, Lucas County, Ohio. Nikola Nedeski is a citizen and resident of Ohio.

34.     Plaintiff Earl R. Oswald III is an individual residing in Temperance, Monroe County, Michigan. Earl R. Oswald III is a citizen and resident of Michigan.

35.     Plaintiff Panfilo Ramon, Jr. is an individual residing in Wauseon, Fulton County, Ohio. Panfilo Ramon, Jr. is a citizen and resident of Ohio.

36.     Plaintiff Jason Renner is an individual residing in Rossford, Wood County, Ohio. Jason Renner is a citizen and resident of Ohio.

37.     Plaintiff William D. Renner is an individual residing in Perrysburg, Wood County, Ohio. William D. Renner is a citizen and resident of Ohio.

38.     Plaintiff Sharon Riger-Long is an individual residing in Toledo, Lucas County, Ohio. Sharon Riger-Long is a citizen and resident of Ohio.

39.     Plaintiff Tracey Rivard is an individual residing in Newport, Macomb County, Michigan. Tracey Rivard is a citizen and resident of Michigan.

40.     Plaintiff Dennis J. Ross is an individual residing in Lambertville, Monroe County, Michigan. Dennis J. Ross is a citizen and resident of Michigan.

41.     Plaintiff Howard F. Rudes is an individual residing in Toledo, Lucas County, Ohio. Howard F. Rudes is a citizen and resident of Ohio.

42.     Plaintiff Jamie Schetter is an individual residing in New Riegel, Seneca County, Ohio. Jamie Schetter is a citizen and resident of Ohio.

43.     Plaintiff Donald J. Sinclair is an individual residing in Trenton, Wayne County, Michigan. Donald J. Sinclair is a citizen and resident of Michigan.

44.     Plaintiff Matthew Smith is an individual residing in Toledo, Lucas County, Ohio. Matthew Smith is a citizen and resident of Ohio.

45.     Plaintiff Michael Stukenborg is an individual residing in Oregon, Lucas County, Ohio. Micheal Stukenborg is a citizen and resident of Ohio.

46.     Plaintiff Marc Styles is an individual residing in Trenton, Wayne County, Michigan. Marc Styles is a citizen and resident of Michigan.

47.     Plaintiff Kelley Szych is an individual residing in Toledo, Lucas County, Ohio. Kelley Szych is a citizen and resident of Ohio.

48.     Plaintiff Paul Ulman is an individual residing in Whitehouse, Lucas County, Ohio. Paul Ulman is a citizen and resident of Ohio.

49.     Plaintiff Sam Withrow is an individual residing in Clyde, Sandusky County, Ohio. Sam Withrow is a citizen and resident of Ohio.

50.     Plaintiff Joseph A. Wood is an individual residing in Tiffin, Seneca County, Ohio. Joseph A. Wood is a citizen and resident of Ohio.

51.     Defendant FCA US LLC is a foreign limited liability company organized under the laws of the State of Delaware.

52.     Defendant International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW International Union") is one of the largest and most diverse labor organizations in the United States, representing over 400,000 active workers and 580,000 retirees.

53.     Defendant United Automobile, Aerospace and Agricultural Implement Workers of America, Region 2B ("UAW Region 2B") is a labor organization and is a constituent part of the UAW International Union responsible for overseeing and supporting UAW locals in Ohio and Indiana.

54.     Defendants UAW International Union and UAW Region 2B shall collectively be referenced as the "UAW Defendants."

## JURISDICTION AND VENUE

55.     This action arises from Plaintiffs' employment at a substantial automobile assembly plant in Toledo, Ohio (the "Jeep Complex") operated by Defendant FCA US LLC. Although employment numbers varied over time, FCA US LLC employs, and the UAW Defendants represents, thousands of workers at the Jeep Complex.

56.     This Court possesses personal jurisdiction over Defendant FCA US LLC because this action arises from its regular transaction of business in this state through the operation of the Jeep Complex.

57.     As set forth below, the UAW Defendants represent workers at the Jeep Complex. This Court possesses jurisdiction over each of the UAW Defendants pursuant to the LMRA at 29 U.S.C. § 185(c)(2).

58.     This action arises from a series of employment and collective bargaining relationships centered at the Jeep Complex in Toledo, Lucas County, Ohio.  Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(1) as a substantial part of the events or omissions giving rise to the claim occurred here.

59.     This Court has subject matter jurisdiction over Plaintiffs' LMRA claims pursuant to 28 U.S.C. § 1331 because they arise under the laws of the United States.  *See*: 29 U.S.C. § 185.

## COMMON FACTUAL ALLEGATIONS

60.     Under various corporate entities, Jeep vehicles and related components have been manufactured at the Jeep Complex, a substantial facility in northern Toledo, since the 1940's.

61.     Over the years, a variety of different Jeep vehicles and components have been manufactured at the Jeep Complex under the auspices of a variety of different corporate structures and contractor/supplier arrangements.

62.     Since the late 1980's, the Jeep brand has been part of the Chrysler family of brands, one of the "Big Three" American automobile manufacturers.  Over the years, Chrysler

has undergone a series of mergers, partnerships, corporate structures and a Chapter 11
Bankruptcy reorganization in 2008-2009.[1]

63.     In 2009, Chrysler emerged from bankruptcy protection with the UAW pension
fund, Fiat S.p.A. (an Italian automaker) and the United States and Canadian government as
principal owners.  Since 2009, Fiat has gradually acquired the other parties' shares and the
Chrysler family of brands is now a wholly owned subsidiary of Fiat: Defendant FCA[2] US LLC.

64.     The UAW, one of the largest labor organizations in the United States, has
historically represented hourly Chrysler workers, along with hourly workers in the automobile
industry in the United States.

65.     The UAW is a hierarchical organization governed by the Constitution of the
UAW International Union.

66.     UAW Members form Local Unions, which bargain with one or a handful of
employers or worksites.  UAW locals are grouped into approximately nine regions, which are
intended to oversee and support local organizing and bargaining activities.  In turn, UAW
International Union oversees and supports all UAW Regions and Locals.

67.     Hourly workers at the Jeep complex are, and have historically been, represented
by United Automobile, Aerospace and Agricultural Implement Workers of America, Local 12
("UAW Local 12").

68.     UAW Local 12 represents multiple UAW bargaining units in the Toledo, Ohio
area.  Relevant to this case, UAW Local 12 represents hourly workers at the paint shop, which
(among other things) painted the new Jeep Wrangler vehicles assembled at the nearby Toledo

---

[1] Unless otherwise specified, "Chrysler" as used herein shall mean the sequence of corporations
that manufactured and marketed Chrysler automobiles, now FCA US LLC.
[2] "FCA" is an abbreviation for "Fiat Chrysler Automotive."

South Assembly Plant.  As set forth below, the "Wrangler Paint Shop" was nominally operated by a number of corporate entities throughout the relevant time period.

69.     In the U.S. automotive industry, collective bargaining agreements between the UAW and the "Big Three" manufacturers (General Motors, Ford and Chrysler) are negotiated in two parts.

70.     Approximately every four years, the UAW International Union bargains for a series of master agreements with each of the Big Three automakers.

71.     With respect to Chrysler, the UAW International Union bargains for two separate master agreements: one covering Engineering, Office and Clerical workers and one covering Production Maintenance and Parts workers.  These agreements cover issues such as changes in wage rates, seniority, grievance processes, attendance polices, hours of work, procedures for transferring from one plant to another, etc.  Of relevance to this case are:

    a.  The 2003-2011 Toledo Assembly Plant agreement, attached hereto as Exhibit 1;

    b.  The 2011 Production Maintenance and Parts agreement, attached hereto as Exhibit 2 (except for minor modifications in 2007 and 2011, this agreement was in effect for the entire time period);

    c.  The Local Agreement dated January 16, 2008, between the UAW International Union, UAW Local 12 and Magna Styer, attached hereto as Exhibit 3;

72.     The UAW International Union and Chrysler have also, from time to time, bargained for various letters, memoranda and supplemental agreements.  In addition, the UAW International Union and Chrysler have bargained for a separate pension agreement covering all Chrysler employees represented by the UAW.

73. The master agreements described in the preceding paragraphs contemplate additional agreements between UAW Local Unions and Chrysler management concerning specific bargaining units, including units at specific Chrysler facilities.  Some issues, such as the specific order of applicable seniority lists, are explicitly left to local negotiation.  In addition,  the UAW Local Unions are permitted limited discretion to bargain with local Chrysler management about particular issues governing a plant or bargaining unit, provided these agreements are consistent with the master agreements bargained for between Chrysler and the UAW International Union.

### Chrysler utilizes nominally independent suppliers to launch a new product at the Jeep Complex

74. In 1998, Chrysler, then an independent company, merged with the German automaker Daimler-Benz AG and became a division of DaimlerChrysler.

75. In the early 2000's, Chrysler constructed a new assembly line in the Jeep Complex to manufacture the 2007 Jeep Wrangler, a significant redesign of the vehicle that began its life as a general-purpose military vehicle prior to the Second World War.

76. Unlike traditional automobile assembly plants, the new assembly line tested a new "collaborative" structure in which third-party suppliers would be co-located and would perform portions of the manufacturing and assembly process traditionally undertaken by Chrysler hourly employees (the "Toledo Supplier Park").

77. The central arrangement in the Toledo Supplier Park, having suppliers perform central assembly functions on Chrysler's premises, is specifically prohibited and/or severely curtailed by the various master agreements in place between the UAW and Chrysler.  For example, the UAW is appointed the exclusive bargaining representative of hourly workers in

Chrysler plants and independent contractors are broadly prohibited from displacing UAW members to undertake traditional assembly work.

78.     In order to operate the Toledo Supplier Park, including the Wrangler Paint Shop, with employees of suppliers and other entities, Chrysler needed the agreement and cooperation of the UAW International and Local unions.

79.     Traditionally, any bargaining concerning the status of UAW members working in a Chrysler plant would involve the UAW International Union, the UAW Local Union (in this case UAW Local 12) and Chrysler management.  When Chrysler was recruiting workers to launch the Toledo Supplier Park, neither Chrysler nor the UAW International Union indicated to Plaintiffs or UAW Local 12 that they intended to deviate from this longstanding pattern.

80.     Initially, Chrysler and the UAW Defendants agreed that UAW workers in the Wrangler Paint Shop would operate under the existing agreement governing the Toledo Assembly Plant and that substantive conditions of employment would mirror those in the rest of the Jeep Complex (Exhibit 1 at p. 34).  That is, Chrysler and the UAW Defendants agreed from the beginning that hourly workers employed by nominally independent suppliers operating various parts of the Toledo Supplier Park would receive substantially identical pay, benefits and working conditions as other Chrysler employees in the Jeep Complex.

81.     As originally planned, Hayden Prism was the supplier identified to operate the paint shop for the new Wrangler line ("the Wrangler Paint Shop").

82.     However, Hayden pulled out of the project at the last minute due to bankruptcy in 2006.  At that time, while the plant was still preparing to start production, Chrysler took direct control of the Wrangler Paint.

83.     Following Hayden's bankruptcy, Chrysler engaged Spherion, a national staffing agency, to operate, mostly off site, certain payroll and human resources functions for hourly employees in the Wrangler Paint Shop.  However, Chrysler employed all managers in the shop. Chrysler made all substantive decisions about production and staffing.

84.     Upon information and belief, during 2006 and 2007, Chrysler worked on finding a replacement for Hayden.  In 2007, Magna Styer agreed to take over the Wrangler Paint Shop.

85.     When the so-called "Toledo Supplier Park" began production: the KUKA group, a German company, was responsible for building the bodies for the Wrangler; Hyundai owned Mobis-Ohio Module Manufacturing Company (OMMC) assembled the vehicle's chassis; and Magna Styer ran the paint shop.  All of these entities worked under the close direction and supervision of Chrysler.

86.     From 2008, hourly workers in the Wrangler Paint Shop were covered by a collective bargaining agreement between the UAW International Union, UAW Local 12 and Magna Styer, attached hereto as Exhibit 3.

87.     Pursuant to both the pre-existing Jeep agreement (Exhibit 1) the Magna Styer agreement (Exhibit 3), wages, benefits and other working conditions in the Wrangler Paint Shop contoured to "mirror" those in the rest of the Jeep Complex.

88.     Seniority plays a significant role in any individual's employment conditions under any of the relevant UAW master or local agreements at issue here. As an UAW member gains seniority, he or she receives regular raises, access to better benefit options and has more choice concerning schedule and job duties.

89.     Each Plaintiff was hired into the Wrangler Paint Shop between approximately 2006 and the middle of 2012 and was assigned a seniority date based upon the date that they

were hired.  For example, an individual hired to work in the Wrangler Paint Shop in January 2007 possessed more seniority than an individual hired in November 2008, who in turn possessed more seniority than an individual hired in February 2012.

90.     During this period, other employees were periodically hired to work in other parts of the Jeep Complex and assigned commensurate seniority dates.

91.     Per the applicable collective bargaining agreements, Plaintiffs received raises in pay, increases in benefits and options concerning their job duties as they advance through seniority levels.  Pursuant to the applicable collective bargaining agreements, these increases in pay and benefits mirrored those of other UAW workers at the Jeep Complex.

92.     Between 2006 and 2011, various other corporate entities undertook Magna Styer's duties under Exhibit 3 as successors In approximate chronological order, these nominal employers consisted of: Hayden, Durr; Spherion; Magna Styer; and Gonzalez.

93.     At all times however, Chrysler operated the Wrangler Paint Shop as part of larger assembly line for the company's Jeep Wrangler vehicles.  This assembly line, in turn, is and was a part of a larger Jeep Complex, owned and operated by Chrysler.  That is, the Wrangler Paint Shop was at all times an integrated part of a Chrysler plant, was located on Chrysler property and exclusively worked on Chrysler vehicles.

94.     During this period, the UAW International Union and UAW Local 12 continued to represent Plaintiffs, as well as all hourly employees at Toledo Supplier Park generally, and the Wrangler Paint Shop in particular.

**Chrysler takes direct control of Wrangler Paint Shop
and eliminates Plaintiffs' seniority and benefits**

18

95.     Between the opening of the Toledo Supplier Park and early 2011, Chrysler had undergone a series of significant corporate transactions, including the end of its partnership with Daimler-Benz, the Chapter 11 Bankruptcy reorganization and purchase by Fiat.

96.     Among these changes, Chrysler undertook a drastic reorganization of the pension plan governing UAW members.  Generally and nationwide, UAW retirees and workers with seniority dates of November 1, 2007 were permitted to remain on the then-existing fixed-benefit pension plans that included retiree health benefits.  In contrast, newer UAW workers who started after November 1, 2007 and earlier were placed on a new and less generous defined contribution retirement plan with no health care benefits after retirement.

97.     A significant number of Plaintiffs began working in the Wrangler Paint Shop prior to November 1, 2007.

98.      By early 2011, the business relationship concerning the Wrangler Paint Shop between Magna Styer and Chrysler had deteriorated.  Generally, Magna Styer no longer desired to operate the Wrangler Paint Shop and Chrysler desired to exercise more direct control over the management of the plant.

99.     Effective March 1, 2011, and pursuant to an agreement with Magna Styer, Chrysler (then "Chrysler LLC," a division of Fiat) took over direct management of the Wrangler Paint Shop.

100.     Pursuant to a letter agreement (attached hereto as Exhibit 4) between Chrysler Human Resources Director P.G. Shagena and UAW Region 2B Director Kenneth Lortz, Chrysler "carried over" the conditions of Exhibit 3 after it took over management of the Wrangler Paint Shop.

101.     Pursuant to Section 3.4 of Exhibit 3, the collective bargaining obligations of the employer could be "assigned" to successor entities.

102.     On behalf of UAW Region 2B, Lortz also agreed in Exhibit 4 to permit Chrysler to "assign" represented employees, including Plaintiffs, to "a third party to be managed by Chrysler."

103.     However, all provisions of the 2008 Magna Styer collective bargaining agreement (Exhibit 3) remained in place, including the conditions mirroring those in other parts of the Jeep Complex.

104.     After March 2011, Chrysler officially exercised direct control of the Wrangler Paint Shop.  Chrysler continued to directly employ all managers in the shop.  Chrysler continued to make all substantive decisions about production and staffing.

105.     However, Chrysler "assigned" Plaintiffs and other hourly workers at the Wrangler Paint Shop to the payroll of Gonzalez Contract Services, LLC ("Gonzalez").

106.     Between early 2011 and middle of 2012, with respect to the Wrangler Paint Shop, Gonzalez performed almost no management or business function besides serving as the nominal employer of the hourly workers inherited from Magna Styer, including Plaintiffs.

107.     Plaintiffs continued to work at a Chrysler facility, reporting exclusively to Chrysler management, making exclusively Chrysler vehicles.  As outlined above, this arrangement was contrary to various master agreements in place between the UAW and Chrysler, which limited or strictly curtailed the use of contract workers in Chrysler facilities.

108.     The UAW International Union agreed to permit the unconventional arrangement to continue, despite its unconventional nature and provisions in the applicable master agreements to the contrary.  During this period, UAW International Union leadership again repeatedly

20

reassured Plaintiffs and the leadership of UAW Local 12 that the arrangement would have no adverse affect on the UAW members working in the Wrangler Paint Shop and that they were, for all intents and purposes, Chrysler employees.

109.    At some point in late 2011 or early 2012, Chrysler and the UAW International Union decided to end the nominal supplier/contractor agreement that had prevailed in the Wrangler Paint Shop since it opened.  The reasons for and timing of this decision were obscure to both Plaintiffs and the leadership of UAW Local 12.  However, the primary goal of both Chrysler and the UAW International Union appeared to involve "insourcing" the Wrangler Paint Shop such that all employees would be traditional employees of Chrysler.

110.    This "insourcing" took the form of Chrysler purporting to "terminate" Gonzalez's contract to perform the nominal payroll and human resources functions with respect to the Wrangler Paint Shop.  As Chrysler expected and intended, this decision resulted directly in Gonzalez purporting to "lay off" all of the UAW employees in the Wrangler Paint Shop.

111.    However, Chrysler had no intention of disrupting production by replacing all of the UAW members in the Wrangler Paint Shop.  Moreover, had Chrysler attempted to do so, the UAW Defendants possessed significant leverage to oppose the move.

112.    Because of the unconventional nature of the of the arrangement governing the Wrangler Paint Shop from the beginning, Chrysler's decision to assert direct control of the plant created a need for collective bargaining concerning the status of UAW employees in the Wrangler Paint Shop.

113.    The bargaining between the UAW International Union and Chrysler in 2012 concerning the status of the employees of the Wrangler Paint Shop was marred by several procedural and substantive irregularities.

114.    First, a small number of UAW International Union executives, lead by then Vice President of the UAW International Union's Chrysler Division General Holiefield, took over bargaining concerning the status of employees at Wrangler Paint Shop.  This group included, among others, Holiefield's aid James Hardy and UAW International Union Region 2B representative Jim Waingrow.

115.    At the time, Holiefield was the Vice President of the UAW International Union's Chrysler division.  As such, Holiefield was the top executive responsible for representing the UAW International Union in collective bargaining with Chrysler.  The other UAW International Union employees involved in bargaining over the status of the Wrangler Paint Shop were subordinate to Holiefield.

116.    In 2012, Holiefield was a long-serving and powerful executive of the UAW International Union who exerted extensive control over the national collective bargaining relationship between Chrysler and the UAW through his official authority, personal relationships and loyalty of his subordinates, many of whom Holiefield hired.

117.    Holiefield and his team from the UAW International Union systematically locked the employees of Wrangler Paint Shop and the leadership of UAW Local Union 12 out of the bargaining with Chrysler over the status of the Union's membership in the Wrangler Paint Shop in 2012.

118.    Holiefield's and UAW International Union's decision to exclude UAW Local Union 12 violates, among other provisions, Article 19, Section 3 of the UAW International Union's Constitution which provides:

> No Local Union Officer, International Officer or International Representative shall have the authority to negotiate the terms of a contract or any supplement thereof with any employer without first obtaining the approval of the Local Union. ***

Neither Holiefield nor the UAW International Union obtained approval form UAW Local 12 to undertake negotiations with Chrysler on behalf of workers in the Wrangler Paint Shop.

119.    Moreover, UAW Local Union 12's exclusion from bargaining with Chrysler is contrary to a long and well-established practice that both the UAW Local and International Unions participate in similar bargaining.

120.    Second, Holiefield and his team from the UAW International Union accepted, apparently without objection or dispute, Chrysler's position that the UAW members working in the Wrangler Paint Shop in late 2012 were solely employed by Gonzalez, had no particular relationship to Chrysler or the applicable master agreements and were functionally equivalent to new hires from the street.

121.    Holiefield and his team inexplicably accepted Chrysler's position on this point, despite:

    a.  a long course of dealing between Chrysler and the UAW International Union concerning the status of its membership working in the Wrangler Paint Shop;

    b.  Chrysler's assumption of an assignment of the local collective bargaining agreement pursuant to Section 3.4 of Exhibit 3;

    c.  the UAW International Union's repeated waivers of provisions of the applicable master agreements, which limited or strictly curtailed the used of contract workers in Chrysler facilities, allegedly in exchange for assurances from Chrysler that these individuals would be treated as Chrysler employees;

    d.  the repeated assurances given by the UAW International Union that the status of these employees would be subject to bargaining between the UAW International Union, UAW Local 12 and Chrysler;

    e.   Plaintiffs' treatment, like all of the employees in the Wrangler Paint Shop, as Chrysler employees, with mirror-image wages and benefits, including a Chrysler employee number that remained consistent throughout the relevant time period until the present; and

    f.   the multiple collective bargaining agreements, and an accompanying course of dealing, that indicated that the pay, benefits and seniority of UAW workers would mirror those in rest of the Jeep Complex.

122.    In approximately November 2012. UAW International Union official Tim Bressler told members of the leadership of UAW Local 12 that Holiefield specifically desired that Chrysler's takeover of the Wrangler Paint Shop proceed as an "insourcing" of new employees. Bressler made it clear that Holiefield believed that this path was the best way forward and that no official at the UAW International Union or UAW Region 2B would question Holiefield's judgment on this point for fear of his or her own position.

123.    Bressler made the representations described in the preceding paragraph for the purposes of discouraging Plaintiffs and the leadership of UAW Local Union 12 from continuing to resist the proposed structure of Chrysler's takeover of the Wrangler Paint Shop.

124.    As set forth above, in the fall of 2012, Chrysler executives and Holiefield's team from the UAW International Union engaged in closed-door negotiations, excluding Plaintiffs or UAW Local 12 officials, in Detroit, Michigan concerning the status of workers at the Wrangler Paint Shop following Chrysler's takeover.

125.    On or about November 14, 2012, Chrysler and the UAW International Union prepared a memorandum titled "Wrangler Paint Shop Understandings," attached hereto as

Exhibit 5, purporting to memorialize an agreement between Chrysler and the UAW International Union.

126.    Pursuant to Exhibit 5, Chrysler would "hire" most UAW members working in the Wrangler Paint Shop.  These workers were stripped of their seniority based upon their actual date of hire and arbitrarily assigned a seniority date of November 30, 2012, or the date that Chrysler purported to officially take over direct management of the Wrangler Paint Shop.  That is, Plaintiffs and all UAW members working in the Wrangler Paint Shop were stripped of their seniority and treated as new hires.

127.    In most cases, wages of UAW members working in the Wrangler Paint Shop would be frozen, regardless of seniority in the plant.  As a result, these workers were deprived of periodic raises that they would otherwise have received pursuant to either the existing Local Agreement (Exhibit 3) or starting pay pursuant to the then-prevailing master agreement with Chrysler (Exhibit 2) based on their actual date of hire.

128.    In addition, Plaintiffs and all UAW members remaining in the Wrangler Paint Shop would be deprived of pension and other benefits to which they would have otherwise been entitled based on their seniority at that plant based on their actual date of hire.

129.    This loss of seniority stripped Plaintiffs who began work in the Wrangler Paint Shop before November 1, 2007 of any right to participate in the more generous fixed-benefit retirement plan, including health benefits, in place prior to Chrysler's bankruptcy.

130.     Pursuant to Exhibit 5, a separate group of individuals who "retired" from Chrysler in order to work at the Wrangler Paint Shop, would be terminated effective November 30, 2012.

131.    Exhibit 5 is signed by Holiefield and UAW Region 2B representative Ken Lortz on behalf to the UAW International Union.

132.    Exhibit 5 is initialed by subordinates of Chrysler Vice President of Employee Relations Alphons Iacobelli on behalf of the company.

133.    Holiefield and the Chrysler executives identified in the previous paragraph reached the terms of the agreement memorialized in Exhibit 5.

134.    On approximately November 18, 2012, the UAW International Union presented a collective bargaining agreement reflecting the substantive terms of Exhibit 5 to the members of UAW Local 12 for ratification.

135.    The November 18 meeting was held less than four days after the agreement reflected in Exhibit 5 was reached and only 12 days before it would take effect.

136.    At the November 18 meeting, for the first time, Jim Waingrow presented the proposed agreement on behalf of the UAW International Union to employees of Wrangler Paint Shop.  Waingrow indicated that the proposal was the result of complex negotiations conducted in good faith between Chrysler and the UAW International Union and, in general, "was the best that could be accomplished under difficult circumstances."

137.    Moreover, Waingrow presented the proposed agreement as a take-it-or-leave-it offer.  Waingrow made it clear that the UAW International Union was not willing to engage in further bargaining over the issue.  Waingrow also emphasized the position of the UAW International Union and Chrysler that, as the result of the years-long course of bargaining between them described above, all UAW members working in the Wrangler Paint Shop were solely employed by Gonzalez, had no particular relationship to Chrysler or the applicable master

26

agreements and, with respect to Chrysler, were functionally equivalent to new hires from the street.

138. As set forth above, Waingrow's statement regarding the status of UAW members working in the paint shop is neither accurate nor complete. Both Chrysler and the UAW International Union repeatedly reassured Plaintiffs and the leadership of UAW Local 12 that Plaintiffs would be fairly treated as a result of the unconventional arrangements in the Toledo Supplier Park. Moreover, as set forth above, Chrysler and the UAW International Union had repeatedly negotiated "waivers" of provisions of the relevant master agreements to permit the arrangement.

139. Waingrow further indicated that, if the UAW members working in the Wrangler Paint Shop failed to approve a bargaining agreement memorializing Exhibit 5 at the November 18 meeting, Chrysler would likely terminate substantially all of these employees in the short term and that the UAW International Union had no intention of taking any further action on their behalf.

140. As a result, the UAW members affected by Exhibit 5, including Plaintiffs, were given only a matter of hours to consider its terms and a very limited opportunity to ask questions of the UAW International Union officials who negotiated the terms of Exhibit 5.

141. In short, Waingrow and the UAW International Union deliberately staged the November 18 meeting to exert the maximum pressure on UAW members working in the Wrangler Paint Shop to approve Exhibit 5 with a minimum amount of time for consideration or scrutiny of the negotiations leading to the proposal.

142. At the November 18 meeting, a majority of UAW members working in the Wrangler Paint Shop approved a bargaining agreement memorializing Exhibit 5.

143.     Upon information and belief, the majority of UAW members working in the Wrangler Paint Shop who voted in favor of approving the proposed agreement at the November 18 meeting were individuals, or close friends or relatives of individuals, who would retain their positions and voted in favor of the proposed agreement out of fear that they would be terminated in the near term if the proposal was not ratified.

144.     Plaintiffs, individually and collectively, attempted to utilize administrative or internal paths to challenge the agreement made by the UAW International Union, including the grievance procedure established by the applicable master and local bargaining agreements between Chrysler and the UAW, as well as an internal appellate procedure established by the UAW International Union Constitution.

145.     Like many grievance procedures established by collective bargaining agreements, both the master and local bargaining agreements involve an escalating series of "steps." Generally, the decision to process grievances at early steps involved UAW stewards working in individual plants and the relevant local union.  As the grievance escalates through the "steps," discretion to process and prosecute any grievance shifts to the UAW International Union.

146.     Pursuant to the applicable master agreements, any decision to process a grievance to an impartial Appeal Board must be made by the UAW International Union.  Any resolution of a grievance prior to this stage requires Chrysler's voluntary agreement.

147.     With respect to Plaintiffs, at the early stages of the grievance process, Chrysler simply denied the claims.

148.     The UAW International Union, which controlled the later stages of the grievance process once it reached beyond the local stage, refused to process any grievance concerning

Plaintiffs' treatment beyond the early stages of the process where the local shop stewards and the local union maintained control.

149.    At the time, the UAW International Union cited the agreement between itself and Chrysler contained in Exhibit 5 as its basis for refusing to process any grievance concerning Plaintiffs' termination.  That is, the UAW International Union purported to exercise its judgment that any such grievance lacked merit because Chrysler's termination of Plaintiffs was consistent with the Exhibit 5.

150.    Jeff Weills and Richard Sheets, who were local officers of the UAW shop committee, prosecuted an internal appeal of, among other issues, Plaintiffs' loss of seniority pursuant to procedures established by the UAW International Union Constitution.  This appeal timely advanced through all stages of the UAW appellate process, including the Public Review Board, an internal UAW body formed "for the purpose of insuring a continuation of the high moral and ethical standards in the administrative and operative practices of the International Union and its subordinate bodies, and to further strengthen the democratic processes and appeal procedures within the Union as they affect the rights and privileges of individual members and subordinate bodies."  *See*: UAW International Union Constitution Article 23, § 1.

151.    The UAW International Union rejected Weills' and Sheets' appeal at all stages, choosing to credit the version of events presented by Holiefield's team from the UAW International Union Chrysler Department: generally, that they negotiated in good faith, reached the best possible deal under the circumstances and had the authority to lock the UAW Local 12 out of negotiations.  In general, the UAW International Union, at all levels of the appellate process, deferred to the judgment of Holiefield's team from the UAW International Union Chrysler Department.

152.    Plaintiffs were unable to obtain any relief concerning their termination, despite exhausting all available remedies available under the applicable collective bargaining agreements and the UAW's internal procedures.

### Federal indictments reveal that UAW International Union executives accepted bribes from Chrysler executives and prospective employees

153.    General Holiefield died in March 2015.

154.    On July 26, 2017, a federal investigation into the Chrysler Department of the UAW International Union became public knowledge when a felony indictment was unsealed in the Eastern District of Michigan against Alphons Iacobelli and Monica Morgan, as well as criminal charges by information against Jerome Durden.

155.    As set forth above, Iacobelli was Chrysler's Vice President of Employee Relations during the fall 2012 negotiations concerning the status of the UAW members in the Wrangler Paint Shop.

156.    Morgan was Holiefield's girlfriend, and later wife, prior to Holiefield's death.

157.    Durden was an accountant and subordinate of Iacobelli at Chrysler.

158.    In general, the July 2017 indictment and surrounding press coverage revealed that Iacobelli diverted millions of dollars from Chrysler from a joint UAW-Chrysler National Training Center to the individual pockets Holiefield, his family and close associates.

159.    Many of these funds were diverted though sham businesses operated by Morgan.

160.    Among other things, Iacobelli caused Chrysler to pay for at least $1.2 million of personal travel, designer cloths, furniture and jewelry.  In addition, Iacobelli caused Chrysler funds to be diverted from the National Training Center to pay off Holiefield's and Morgan's $262,219 personal mortgage.

161.    Such payments violate, among other laws, the NLRA at 29 U.S.C. § 186.

30

162.    As noted above, in 2012, Holiefield was the top UAW International Union official responsible for managing a national collective bargaining relationship with Chrysler involving hundreds of thousands of UAW members.

163.    Similarly, in 2012, Iacobelli was the top-ranking Chrysler executive responsible for bargaining with the UAW.

164.    Iacobelli caused illegal payments of Chrysler funds to be made to Holiefield and other officials of the UAW International Union's Chrysler Department in exchange for company-friendly treatment in collective bargaining negotiations at the expense of UAW members.

165.    As set forth above, Holiefield and his team took control of bargaining concerning the status of the UAW members working in the Wrangler Paint Shop in a manner contrary to the UAW Constitution, and longstanding past practice, by locking the affected employees and UAW Local 12 out of the negotiations.  Having done so, Holiefield and his team negotiated a company-friendly agreement at the expense of Plaintiffs.

166.    Press reports immediately following the July 2017 indictments also revealed that members of the UAW International Union's Chrysler Department were under investigation for "selling jobs," or accepting cash payments of a few thousand dollars, from prospective employees for assistance in finding UAW jobs in Chrysler plants.

167.    James Hardy is under investigation for selling jobs at Chrysler plants.

168.    Despite widespread interest from local Toledo residents, a suspiciously large number of individuals who were hired to replace Plaintiffs relocated from Detroit to accept positions in the Wrangler Paint Shop.  Some such individuals have acknowledged "buying" their jobs.

169.     Thus, Holiefield and his team from the Chrysler Department of the UAW International Union had two separate unlawful motives directly adverse to Plaintiffs at the time that they bargained away Plaintiffs' jobs with Iacobelli and Chrysler.  First, Holiefield and his team had accepted bribes, and hoped to accept additional bribes, from Chrysler to take company-friendly positions at the expense of the UAW members that they represented.  Second, members of the Chrysler Department of the UAW International Union had developed a lucrative side business of selling Chrysler jobs.

## CLASS ACTION ALLEGATIONS

170.     Plaintiffs repeat and incorporate herein all previously pleaded averments.

171.     Plaintiffs Sheets, Wawrzyniak and Weills bring this action pursuant to Fed.R.Civ.P. 23 on behalf of the Class defined as follows:

All individuals who began working at the Wrangler Paint Shop on or before November 29, 2012 and continued after November 30, 2012.

172.     The members of the Class are so numerous that joinder is impracticable. Plaintiffs believe that there are hundreds of such individuals.

173.     The members of the Class can be identified through the review of business records in the possession of Chrysler, the UAW International Union and UAW Local 12.

174.     There are common questions of fact and law affecting all class members, including, among others:

a.   Whether Chrysler and the UAW International Union reasonably interpreted the applicable master and local collective bargaining agreements, as informed by the years-long course of dealing between the company, UAW International Union and UAW Local 12, as permitting Chrysler to engineer a situation where all of the

UAW members working in the Wrangler Paint Shop were "laid off" by Gonzalez and considered for "rehire" by Chrysler;

b.  Whether the UAW International Union acted in good faith when it locked its membership and local union out of negotiations concerning the status of its membership working in the Wrangler Paint Shop;

c.  Whether Chrysler paid, and the UAW International Union Chrysler Department accepted, bribes in order to take company-friendly negotiation-positions at the expense of UAW members, including members of the Class;

d.  Whether the UAW International Union Chrysler Department bargained in good faith on behalf of members of the Class in the fall of 2012;

e.  Whether officials in the UAW International Union Chrysler Department accepted bribes to fill the jobs vacated by Plaintiffs and members of the Class in the Wrangler Paint Shop;

175.    The Plaintiffs' claims are typical of all members of the Class as they were terminated as the result of the same collective bargaining agreement, at the same time and for the same pretextual reasons as members of the Class.

176.    Plaintiffs will fairly and adequately represent the interests of members of the Class.

177.    Both Plaintiffs and their counsel meet the adequacy requirements of Fed.R.Civ.P. 23.

178.    Plaintiffs' interests are not antagonistic to other members of the Class and are, in fact, similar with respect to Chrysler and the UAW International Union.  Plaintiffs' interests are identical to those of the members of the Class.

179.    Plaintiffs' legal counsel has a time-honored reputation for competency, experience and skill in handling complex litigation, including class actions.  Their counsel's ability to skillfully litigate cases such as the present case is well-documented. Their counsel has and will continue to dedicate high levels of skill and dedication to the vigorous prosecution of this class action litigation.

180.    A class action is a superior method of resolution to the other available methods for a fair, efficient and just resolution of this controversy.

181.    The expense and burden of individual litigation are impediments to Class members seeking redress for the wrongful conduct alleged.

182.    This action is maintainable under Fed.R.Civ.P. 23(b)(3) because common questions of fact and law, as outlined above, predominate over questions affecting only individual class members, which focus almost exclusively on the amount of damages owed in the form of back wages, front wages, lost benefits and other compensation, including compensatory damages, punitive damages and interest.

183.    A class action is a superior method to other mechanisms available.  The amount in controversy with respect to each individual member of the Class is relatively modest and the prosecution of separate actions is comparatively costly.

## FIRST CAUSE OF ACTION
### (Violations of the LMRA Against All Defendants)

184.    Plaintiffs repeat and incorporate herein all previously pleaded averments.

185.    Plaintiffs bring their first cause of action against all Defendants pursuant to Section 301 of the LMRA, codified at 29 U.S.C. § 185.

186.    As set forth above, Chrysler stripped Plaintiffs of their seniority in violation of the applicable master and local bargaining agreements between Chrysler and the UAW.

187.    Moreover, as set forth above, Chrysler unlawfully paid bribes to executives of the UAW International Union to take company-friendly positions during collective bargaining negotiations, including those leading to the loss of Plaintiffs' seniority in 2012.

188.    Plaintiffs sought to prosecute grievances pursuant to the applicable collective bargaining agreements, but the UAW International Union refused to process their grievances beyond any stage over which it had discretion.

189.    In the alternative, any further attempt to prosecute grievances by Plaintiffs would have been futile under the circumstances described above.

190.    Plaintiffs have exhausted all internal union procedures with respect to their terminations.

191.     In the alternative, any further attempt to utilize internal union procedures by Plaintiffs would have been futile under the circumstances described above.

192.    As set forth above, the UAW International Union acted in an arbitrary, discriminatory and dishonest manner in its duty to represent Plaintiffs in the bargaining process that resulted in the November 2012 agreement stripping them of their seniority.

193.    Through its arbitrary, discriminatory and bad-faith conduct, the UAW International Union has breached its duty of fair representation to their members, including Plaintiffs.

194.    Due to the UAW International Union's breach, Plaintiffs have sustained damages, including lost wages and benefits to which they would have been entitled based on their seniority.

195.     Plaintiffs bring this hybrid action against Chrysler and the UAW International Union to recover all legal and equitable relief available, including reinstatement, an award of

back pay, an award of front pay, consequential and compensatory damages, punitive damages, costs and reasonable attorney's fees.

196.     Had the UAW International Union appropriately represented Plaintiffs, this action would not be necessary.  Plaintiffs are entitled to recover their costs and reasonable attorneys' fees as an element of actual damages as a result of the UAW International Union's breach.

197.     As described above, Plaintiffs were unable to discover the UAW International Union's breach of its duty of fair representation until the federal investigation became public knowledge in July 2017.  As set forth above, Plaintiffs had no way of knowing that executives in the UAW International Union had accepted bribes to act against their interest until this investigation became public.

**WHEREFORE,** the individual Plaintiffs named above and Plaintiffs Sheets, Wawrzyniak and Weills on behalf of themselves and others similarly situated, demand judgment against Defendants, jointly and severally, in an amount to be determined by a jury and further demand judgment as follows:

A.  That this Court, as soon as practicable, certify the Class defined herein and appoint the undersigned counsel to represent it;

B.  For injunctive and declaratory relief ordering the reinstatement of their seniority;

C.  For damages in an amount to be determined by a jury, including back pay, front pay, compensatory damages, punitive damages and whatever additional monetary relief may be available in law and equity;

D.  For an award of reasonable attorney's fees, costs and expert witness fees; and

E. For whatever additional legal and equitable relief may be available under the
   circumstances.


Respectfully submitted,


/s/ Leslie O. Murray
Leslie O. Murray (0081496)
Direct Dial: (419) 624-3125
lom@murrayandmurray.com
John T. Murray (008793)
jotm@murrayandmurray.com
Michael J. Stewart (0082257)
stewart@murrayandmurray.com
**MURRAY & MURRAY CO., L.P.A.**
111 East Shoreline Drive
Sandusky, OH 44870
Facsimile: (419) 624-0707

*Attorneys for Plaintiffs*


## **JURY DEMAND**

Plaintiffs hereby demand trial by jury as to all issues.

/s/ Leslie O. Murray
Leslie O. Murray (0081496)
**MURRAY & MURRAY CO., L.P.A.**

*Attorneys for Plaintiffs*